T.C. Memo. 2009-97

UNITED STATES TAX COURT

OWEN D. SNYDER AND LILLIE M. SNYDER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15222-05.                    Filed May 14, 2009.

Owen D. Snyder and Lillie M. Snyder, pro sese.

<u>Catherine S. Tyson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined deficiencies and
accuracy-related penalties under section 6662(a)[1] with respect to
petitioners' Federal income tax as follows:

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

| Year | Deficiency | Penalty sec. 6662 |
|------|-----------|-------------------|
| 1999 | $17,633 | $3,526.60 |
| 2000 | 14,966 | 2,993.20 |
| 2001 | 14,386 | 2,877.20 |

After a concession,[2] the issues for decision are:  (1) Whether petitioners are entitled to depreciation deductions claimed on Schedules C, Profit or Loss From Business, of their Forms 1040, U.S. Individual Income Tax Return, relating to a pay phone and automatic teller machine (ATM) activity for 1999-2001; (2) whether gross receipts from the pay phone and ATM activity that petitioners reported on their 1999-2001 Schedules C should be reclassified as other income; (3) whether petitioners are entitled to claim a disabled access credit under section 44 for 1999-2001; and (4) whether petitioners are liable for the section 6662(a) accuracy-related penalty for 1999-2001.

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference.  Petitioners resided in Missouri when the petition was filed.

Background

Owen D. Snyder (Mr. Snyder) has been preparing income tax returns since 1960.  Mr. Snyder obtained a degree in economics

---

[2]Respondent concedes the adjustments in the notice of deficiency shown as "Schedule C - Total expense (math error)" for 1999-2001.

from Washington University and attended Washington University Law School for 1 year.  He joined the military, and after receiving an honorable discharge, he took summer law courses at the University of Wisconsin but never obtained a law degree. Thereafter, Mr. Snyder worked for General American Life Insurance Co. and then A.G. Edwards.

While at A.G. Edwards, Mr. Snyder had the opportunity to take over his aunt's tax preparation business after she suffered a stroke.  He attended night courses taught by a tax attorney at Washington University and began his tax preparation business. In 1966 Mr. Snyder became an enrolled agent entitled to practice before the Internal Revenue Service, and his enrollment remains in good standing.

Around 1997 Mr. Snyder received a postcard from Alpha Telcom, Inc. (Alpha Telcom), marketing a "New Tax Favored Program" that promised to "Eliminate Your Client's Tax Problems" and also promised 10- to 17-percent commissions to sales representatives.  Mr. Snyder contacted Alpha Telcom by telephone and spoke with Alpha Telcom's chief marketer, Charles Tummino (Mr. Tummino).  Mr. Snyder told Mr. Tummino that he was not interested because he knew about the Paramount pay phone litigation where an investment contract for pay phones was deemed a security, but Mr. Tummino assured Mr. Snyder that Alpha Telcom's program addressed the problems associated with the

Paramount pay phone litigation. Alpha Telcom sent him a video and a brochure explaining the pay phone program.

Mr. Snyder again spoke with Mr. Tummino and requested something signed in writing from an attorney or a certified public accountant involved in the Alpha Telcom program. Mr. Snyder received various forms of information from Alpha Telcom, including Alpha Telcom brochures, several letters from attorneys and from Perkins & Co., P.C., an accounting and business consulting firm,[3] addressed to Paul Rubera, president of Alpha Telcom, and résumés of two attorneys who were supposedly involved in the Alpha Telcom program. Mr. Snyder also paid for and received a Dun & Bradstreet Business Information Report regarding Alpha Telcom.

Mr. Snyder became an authorized sales representative for Alpha Telcom after taking an examination. He provided information about the Alpha Telcom program to some of his clients. After some of them invested in the program, Mr. Snyder began receiving commissions of 10 to 18 percent of his clients' investments in the Alpha Telcom program. Mr. Snyder advised the clients on the benefits of depreciation deductions and of the disabled access credit in connection with their investments in the Alpha Telcom program.

---

[3]The letters addressed whether the Alpha Telcom program investment contract was a security and whether Alpha Telcom pay phone owners qualified for the disabled access credit.

Mr. Snyder invested approximately $49,000 of his own money in 11 Alpha Telcom pay phones. He never personally saw the pay phones he purchased[4] but relied on photographs of the phones provided by Alpha Telcom. Mr. Snyder entered into a service agreement with a service provider related to Alpha Telcom that, under the terms of the agreement, was responsible for, among other things, collecting and reporting the revenues generated by the pay phones. Mr. Snyder did not take any steps to ensure or confirm that the service provider correctly reported the revenue.

In addition to the pay phones, in 2000 Mr. Snyder invested in one ATM for $12,250 from National Equipment Providers, L.L.C. (NEP). The ATM did not dispense cash but instead dispensed coupons that were exchangeable for cash in stores. Mr. Snyder entered into a service agreement with a service provider to service the ATM, and the service provider was responsible for selecting the location for the ATM. Mr. Snyder began receiving $100 per month for the ATM. However, Mr. Snyder was dissatisfied with the monthly payments from the service provider, and he wanted to move the ATM from California to South Carolina. In 2003 Mr. Snyder sold the ATM to ATM Network Services, Inc., for $2,000.

---

[4]We use the term "purchase" to mean that Mr. Snyder acquired an interest in the pay phones for consideration, but our use of the term should not be construed to mean that Mr. Snyder acquired a depreciable interest in the pay phones.

Federal Income Tax Reporting

For 1999 petitioners filed a Form 1040 that included a Schedule C for Mr. Snyder's tax preparation business.[5]  On the Schedule C petitioners claimed a $19,568 depreciation deduction. A detail sheet attached to the Schedule C showed that $19,360 of the depreciation deduction related to the Alpha Telcom pay phones and the balance related to office furniture and a laser printer. Petitioners also attached to their Form 1040 a Form 8826, Disabled Access Credit, claiming a $3,484 disabled access credit for 1999,[6] which they used to offset their 1999 Federal income tax liability.

For 2000 petitioners filed a Form 1040 that included a Schedule C for Mr. Snyder's tax preparation business.  On the Schedule C petitioners claimed a $7,973 depreciation deduction. Petitioners also attached a Form 4562, Depreciation and Amortization (Including Information on Listed Property), with a supplement.  The Form 4562 supplement showed that $7,250 of the depreciation deduction related to the ATM, $416 related to the Alpha Telcom pay phones, and the balance related to the office furniture and the laser printer.  Petitioners also claimed a

---

[5]Petitioners claimed the income and depreciation deduction relating to the pay phone and ATM activity on their Schedule C for Mr. Snyder's tax preparation business.

[6]On the Form 8826, petitioners claimed total eligible access expenditures of $25,000 for 1999.

$5,000 current year disabled access credit on Form 8826. That credit was used to calculate petitioners' general business credit of $3,372 for 2000.[7]

For 2001 petitioners filed a Form 1040 that included a Schedule C on which they claimed a $1,134 depreciation deduction and a $3,905 disabled access credit.[8]

On July 29, 2005, respondent sent petitioners a notice of deficiency for 1999-2001. In the notice respondent determined the following: (1) Petitioners were not entitled to the depreciation deductions they claimed on their 1999-2001 Schedules C; (2) petitioners did not report on their 1999-2001 Forms 1040 other income shown on Forms 1099-MISC, Miscellaneous Income, from Alpha Telcom; (3) petitioners were not entitled to the disabled access credit claimed on their 1999-2001 Forms 1040; and (4) petitioners were liable for an accuracy-related penalty under section 6662(a) for 1999-2001.[9] Petitioners filed a petition contesting respondent's determinations.

---

[7]On Form 3800, General Business Credit, petitioners claimed the $5,000 credit reported on the Form 8826, a $1,516 carryforward of a general business or ESOP credit to 2000, and a $1,516 carryback of a general business credit from 2001.

[8]Neither the 2001 Form 1040 nor its attachments were introduced into evidence.

[9]Respondent also proposed several computational adjustments.

OPINION

I.  Depreciation Deductions

Section 167(a) generally allows a depreciation deduction for the exhaustion and wear and tear of property used in a trade or business or property held for the production of income. Depreciation deductions are based on an investment in and actual ownership of property rather than on possession of bare legal title.  Arevalo v. Commissioner, 124 T.C. 244, 251 (2005), affd. 469 F.3d 436 (5th Cir. 2006).[10]  The mere transfer of legal title does not transfer the incidents of taxation attributable to property ownership where the transferor retains significant control over the property.  See Crooks v. Commissioner, 453 F.3d 653, 656 (6th Cir. 2006); Arevalo v. Commissioner, supra at 251; see also Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978).

A taxpayer is entitled to depreciation deductions with respect to property only if the benefits and burdens of owning the property have passed to the taxpayer.  Arevalo v. Commissioner, supra at 251.  Whether the taxpayer has received

_____

[10]In their brief petitioners repeatedly argue that we stated during trial that in deciding this case we would not rely on Arevalo v. Commissioner, 124 T.C. 244 (2005), affd. 469 F.3d 436 (5th Cir. 2006), and Crooks v. Commissioner, 453 F.3d 653 (6th Cir. 2006).  Petitioners are mistaken.  At trial we simply stated that the parties' pretrial memoranda are not evidence in this case.  We did not indicate that we would refrain from relying on relevant cases in our opinion.

the benefits and burdens of ownership is a question of fact that must be determined from the parties' intent as established by written agreements read in the light of the attending facts and circumstances. Id. at 251-252; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). This Court and several Courts of Appeals have held that taxpayers who invested in Alpha Telcom pay phones did not receive the benefits and burdens of owning the pay phones that were required to claim depreciation deductions under section 167. Crooks v. Commissioner, supra at 656; Arevalo v. Commissioner, supra at 253; Sita v. Commissioner, T.C. Memo. 2007-363, affd. without published opinion 103 AFTR 2d 2009-1174, 2009-1 USTC par. 50,275 (7th Cir. 2009).

In Arevalo v. Commissioner, supra at 252, we identified eight factors for determining whether a taxpayer who invested in Alpha Telcom pay phones, like Mr. Snyder, held the burdens and benefits of owning the pay phones. Those factors include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage

to the property; and (8) which party receives the profits from the operation and sale of the property.  Id.

Mr. Snyder received only bare legal title to the pay phones. He never had control over or possession of the pay phones, and all information regarding the existence and location of the pay phones came from Alpha Telcom.[11]  Alpha Telcom controlled the location of the pay phones and entered into site agreements for them, collected monthly revenues, paid vendor commissions and fees, and repaired and maintained the pay phones.  If the monthly adjusted gross revenues exceeded the base amount, Alpha Telcom was entitled to 70 percent of the revenues.[12]  If the monthly adjusted gross revenues were equal to or less than the base amount, Mr. Snyder was entitled to 100 percent of the revenues and owed no monthly fee.[13]  The record does not show that Mr. Snyder paid any property taxes, insurance premiums, or license fees with respect to the pay phones.

_____

[11]Although Mr. Snyder testified that he called the businesses where his pay phones were supposedly located, he never made any further effort to establish that his pay phones existed in those locations.  Moreover, after Alpha Telcom filed for bankruptcy, Mr. Snyder did not take possession of the pay phones.

[12]The telephone service agreement that Mr. Snyder signed is not in the record.  However, Mr. Snyder testified that he selected option or level 4, which generally provided as summarized above.

[13]Alpha Telcom often paid Mr. Snyder a base amount of $46.67 or $58.34 regardless of pay phone revenue.

Mr. Snyder also received only bare legal title to the ATM. He never took possession of the ATM, and he received only a fixed monthly check of $100 regardless of the revenue the ATM generated.

After analyzing the facts and circumstances surrounding the pay phones and ATM in which Mr. Snyder invested, we conclude that the factors weigh against him. Mr. Snyder never received the benefits and burdens of ownership with respect to the pay phones and the ATM. Therefore, we sustain respondent's determination disallowing petitioners' 1999-2001 depreciation deductions.[14]

## II. Alpha Telcom Income

Respondent argues that petitioners should have reported the gross receipts with respect to Mr. Snyder's Alpha Telcom pay phones as other income on their 1999-2000 Form 1040 instead of reporting them on their Schedules C.[15] We agree. As we have

---

[14]Respondent disallowed all depreciation deductions claimed on petitioners' 1999-2001 Schedules C, including minor amounts of depreciation for office furniture and a laser printer. Although the record does not show whether the depreciation for the office furniture and the laser printer related to the pay phone/ATM activity or Mr. Snyder's tax preparation business, petitioners introduced no evidence to substantiate the depreciation for those items. Thus, we sustain respondent's determination disallowing all depreciation deductions for 1999-2001. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

[15]In the notice of deficiency respondent determined that Alpha Telcom issued petitioners Forms 1099-MISC, Miscellaneous Income, showing petitioners received $3,020, $13,424, and $25,360, for 1999, 2000, and 2001, respectively. Although respondent did not introduce the Forms 1099-MISC in evidence, the
(continued...)

already stated, Mr. Snyder never received the benefits and burdens of ownership with respect to the pay phones and the ATM that would entitle him to the incidents of taxation attributable to their ownership. Because Mr. Snyder never had the benefits and burdens of owning the pay phones or the ATM and did not conduct a business involving the pay phones or the ATM, we conclude that he was not engaged in a trade or business with respect to the pay phone/ATM activity. Consequently, we sustain respondent's determination that the Alpha Telcom income, which apparently was included in the gross receipts reported on Mr. Snyder's Schedules C, should have been reported on petitioners' Forms 1040 as other income. See sec. 1.61-14, Income Tax Regs.

III. Disabled Access Credit

For purposes of the general business credit under section 38, section 44(a) provides a disabled access credit for certain small businesses. The amount of the credit is equal to 50 percent of the "eligible access expenditures" of an "eligible small business" that exceed $250 but that do not exceed $10,250 for the year. Sec. 44(a). To claim the credit, a taxpayer must show that (1) the taxpayer is an "eligible small business" during

_____

[15](...continued) parties stipulated Mr. Snyder's bank checking account records showing that he received monthly payments from Alpha Telcom in those years. Moreover, petitioners concede in their brief that the Alpha Telcom income reported on Forms 1099-MISC was included in gross receipts or sales on their Schedules C.

the year, and (2) the taxpayer has made "eligible access expenditures" during the year.

The term "eligible small business" means a taxpayer who elects the application of section 44 and had gross receipts of no more than $1 million or no more than 30 full-time employees during the preceding year.  Sec. 44(b).  The term "eligible access expenditure" means amounts paid or incurred to enable an eligible small business to comply with the requirements under the ADA.[16]  Sec. 44(c)(1).  Only a taxpayer who has an obligation to comply with the ADA requirements can make an eligible access expenditure.  As relevant here, the ADA requirements apply to (1) persons who own, lease, lease to, or operate certain "public accommodations" and (2) "common carriers" of telephone voice transmission services.  See 42 U.S.C. sec. 12182(a) (2006);  47 U.S.C. sec. 225(c) (2006).

This Court and several Courts of Appeals have held that taxpayers who invested in Alpha Telcom pay phones did not have an

---

[16]Eligible access expenditures include amounts paid or incurred (1) for removing architectural, communication, physical, or transportation barriers that prevent a business from being accessible to, or usable by, individuals with disabilities; (2) to provide qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (3) to acquire or modify equipment or devices for individuals with hearing impairments; or (4) to provide other similar services, modifications, materials, or equipment.  Sec. 44(c)(2).  However, eligible access expenditures do not include expenditures that are not necessary to accomplish such purposes.  See sec. 44(c)(3).

obligation to comply with the requirements set forth in the ADA. <u>Crooks v. Commissioner</u>, 453 F.3d at 657; <u>Arevalo v. Commissioner</u>, 124 T.C. at 257-258; <u>Sita v. Commissioner</u>, T.C. Memo. 2007-363. This case is no different.  Mr. Snyder did not own, lease, lease to, or operate a public accommodation with respect to the pay phone and ATM activity.  Therefore, Mr. Snyder was not obligated to comply with ADA requirements, and he did not make any eligible access expenditures with respect to the pay phone and ATM activity.  We conclude that petitioners are not entitled to the disabled access credit for 1999-2001.

IV.  <u>Section 6662 Penalty</u>

Respondent determined that petitioners are liable for the accuracy-related penalty under section 6662 for 1999-2001. Respondent asserts that petitioners are liable for the section 6662 penalty for each year on alternative grounds:  (1) The underpayment is attributable to negligence or disregard of rules or regulations within the meaning of section 6662(b)(1); or (2) there was a substantial understatement of income tax within the meaning of section 6662(b)(2).

Section 6662(a) and (b)(1) authorizes the Commissioner to impose a penalty in an amount equal to 20 percent of the underpayment attributable to negligence or disregard of rules or regulations.  Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal

Revenue Code. Sec. 6662(c); see also <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances). Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Section 6662(a) and (b)(2) authorizes the Commissioner to impose a 20-percent penalty if there is a substantial understatement of income tax. A substantial understatement of income tax with respect to an individual taxpayer exists if the amount of the understatement for the taxable year exceeds 10 percent of the tax required to be shown on the return for the taxable year or $5,000, whichever is greater. Sec. 6662(d)(1)(A).

The Commissioner bears the initial burden of production with respect to a taxpayer's liability for the section 6662 penalty, in that the Commissioner must first produce sufficient evidence to establish that the imposition of the section 6662 penalty is appropriate. Sec. 7491(c). If the Commissioner satisfies his initial burden of production, the burden of producing evidence to refute the Commissioner's determination and to establish that the

taxpayer is not liable for the section 6662 penalty shifts to the taxpayer. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent has carried his burden of production by showing that Mr. Snyder did not make a reasonable effort to evaluate whether his arrangement with Alpha Telcom entitled him to the depreciation deductions and disabled access credits that petitioners claimed on their 1999-2001 tax returns. Alternatively, respondent has carried his burden of production by showing that petitioners substantially understated their 1999-2001 Federal income tax. Because respondent met his burden of production, petitioners must come forward with sufficient evidence to persuade the Court that respondent's determination is incorrect. See id. at 446-447.

Petitioners' arguments in support of their position that they are not liable for the section 6662 penalty are neither precise nor clear. Petitioners do not contend that there was no substantial understatement of income tax for the years at issue or that they satisfy the adequate disclosure and substantial authority provisions of section 6662. See sec. 6662(d)(2)(B). Petitioners' arguments focus primarily on the reasonableness of Mr. Snyder's investigation into Alpha Telcom and the pay phone/ATM programs that it and its affiliated companies were

marketing.[17]  Reasonably construed, the arguments require us to consider whether petitioners may be excused from liability for the section 6662 penalty because they qualify for relief under section 6664(c)(1).  Section 6664(c)(1) provides that no penalty shall be imposed under section 6662 with respect to any portion of an underpayment if it is shown that there was reasonable cause for that portion and that the taxpayer acted in good faith with respect to that portion.

The record does not support a finding that Mr. Snyder made a reasonable effort to investigate the Alpha Telcom program and its tax ramifications before he made his investment in the program or that Mr. Snyder had reasonable cause and acted in good faith within the meaning of section 6664(c)(1).  Although Mr. Snyder requested information about the pay phone and ATM programs from Alpha Telcom and/or NEP and received copies of documents generated by various attorneys and by an accounting and business consulting firm addressed to Alpha Telcom and/or NEP,[18] all of the information he received came from Alpha Telcom, NEP, or professionals who were advising the companies promoting the programs.  Although Mr. Snyder made an effort to find out whether

---

[17]Petitioners' arguments also focus on respondent's allegedly abusive behavior in attacking the Alpha Telcom programs.

[18]Mr. Snyder also obtained a Dun & Bradstreet report on Alpha Telcom.

an investment contract for the program would be treated as a security, he did not conduct any independent research regarding whether the pay phone/ATM program as structured would qualify as a business, whether his interests in the pay phones and the ATM were depreciable interests, and whether the activity would satisfy the requirements of section 44.  Mr. Snyder, an experienced return preparer, should have realized that his unverified reliance on representations of the promoter and the promoter's advisers was not sufficient to protect him from liability for the section 6662 penalty.  See, e.g., <u>Vincentini v. Commissioner</u>, T.C. Memo. 2008-271; <u>Rogers v. Commissioner</u>, T.C. Memo. 2005-248.

Because petitioners failed to prove that they had reasonable cause for the underpayments or that they acted in good faith regarding the underpayments, we sustain respondent's determination and hold that petitioners are liable for the section 6662 accuracy-related penalty with respect to their 1999-2001 returns.

We have considered all arguments raised by the parties, and to the extent not discussed, we find them to be irrelevant, moot, or without merit.

<u>Decision will be entered</u>

<u>under Rule 155</u>.