T.C. Memo. 2009-99

UNITED STATES TAX COURT

KEVIN T. DOHERTY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6883-06.                    Filed May 14, 2009.

Kevin T. Doherty, pro se.

<u>Catherine S. Tyson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined deficiencies with respect to petitioner's Federal income tax of $26,455 for 2000 and $5,327 for 2001.  The issues for decision are:  (1) Whether petitioner is entitled to certain deductions he claimed on Schedules C, Profit or Loss From Business, relating to a pay phone and automatic teller machine (ATM) activity for 2000 and

2001; (2) whether petitioner had unreported income from the pay phone and ATM activity for 2001; (3) whether gross receipts from the pay phone and ATM activity that petitioner reported on his 2000 Schedule C should be reclassified as other income; and (4) whether petitioner is entitled to claim a disabled access credit under section 44[1] for 2000 and 2001.

FINDINGS OF FACT

The parties have stipulated some of the facts, which we incorporate in our findings by this reference. Petitioner resided in Missouri when the petition was filed.

In 1999 petitioner inherited from his father, Thomas Doherty (Mr. Doherty), an interest in an Alpha Telcom, Inc. (Alpha Telcom), program involving pay phones. After receiving proceeds from the Alpha Telcom pay phones, petitioner wanted to learn more about the pay phones and contacted Alpha Telcom and Owen Snyder (Mr. Snyder), Mr. Doherty's and petitioner's income tax preparer. Petitioner asked Mr. Snyder to help him acquire additional pay phones.

On August 1, 1999, petitioner entered into an agreement with ATC, Inc. (ATC), Alpha Telcom's wholly owned subsidiary, entitled "Telephone Equipment Purchase Agreement" (pay phone purchase

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

agreement) to purchase[2] 20 pay phones for $5,000 each.[3]
Petitioner paid Alpha Telcom $100,000 in accordance with the pay
phone purchase agreement. Under the pay phone purchase
agreement, ATC was responsible for finding sites for and
installing the pay phones. The pay phone purchase agreement
included an attachment entitled "Telephone Equipment List"; but
when petitioner signed the agreement, the attachment did not
identify the pay phones petitioner was purchasing. The pay phone
purchase agreement stated that the "Phones have approved
installation under The [Americans] with Disabilities Act (ADA)."

On the same day, petitioner entered into a 3-year agreement
with Alpha Telcom entitled "Telephone Services Agreement" (pay
phone service agreement). Under the pay phone service agreement,
Alpha Telcom was responsible for collecting monthly revenue
generated by the pay phones, paying commissions and fees to
vendors, repairing and maintaining the pay phones, and making
necessary capital improvements. In exchange for managing and
operating the pay phones, Alpha Telcom was entitled to 70 percent
of the monthly adjusted gross revenue from the pay phones.
However, if the monthly adjusted gross revenue did not exceed

---

[2]We use the term "purchase" to mean that petitioner acquired
an interest in the pay phones for consideration, but our use of
the term should not be construed to mean that petitioner acquired
a depreciable interest in the pay phones.

[3]In November 1999 petitioner purchased 20 additional pay
phones for a total of $100,000.

$58.34, petitioner would be entitled to 100 percent of the revenue and would owe no monthly fee to Alpha Telcom. In addition, Alpha Telcom promised to pay petitioner a monthly base amount of at least $58.34 per pay phone, and petitioner received from Alpha Telcom several payments in that amount.

The pay phone service agreement included an attachment entitled "Buy Back Election" wherein Alpha Telcom agreed to buy back the pay phones in exchange for a fixed price stated in the attachment. After 36 months Alpha Telcom would buy back any pay phone for the full purchase price.

In addition to the pay phones, petitioner also invested in ATMs. On July 17, 2000, petitioner entered into an agreement with National Equipment Providers, LLC (NEP), entitled "Equipment Purchase Agreement" (ATM purchase agreement) to purchase two ATMs for $12,250 each. The ATM purchase agreement included a right of first refusal whereby petitioner would offer to sell the ATMs back to NEP before selling them to a third party. On the same day, petitioner entered into an agreement with International Technology System, Inc. (ITS), entitled "Service & Third Party Administration Agreement" (ATM service agreement). Under the ATM service agreement, ITS was responsible for installing, operating, and servicing the ATMs.

On August 24, 2001, Alpha Telcom filed for bankruptcy under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court

for the Southern District of Florida.  See <u>Arevalo v. Commissioner</u>, 124 T.C. 244, 249 (2005), affd. 469 F.3d 436 (5th Cir. 2006).  The case was later transferred to the U.S. Bankruptcy Court for the District of Oregon.  <u>Id.</u>  On September 10, 2003, the bankruptcy case was dismissed by motion of Alpha Telcom.  <u>Id.</u>  The bankruptcy court held that it was "'in the best interest of creditors and the estate to dismiss so that proceedings could continue in federal district court, where there was a pending receivership involving debtors.'"  <u>Id.</u>

In 2001 the Securities and Exchange Commission (SEC) brought a civil enforcement action against Alpha Telcom in the U.S. District Court for the District of Oregon.  <u>Id.</u>  The District Court held that the pay phone program investment contract was actually a security and that Alpha Telcom violated Federal law by not registering the program with the SEC.  <u>Id.</u>; <u>SEC v. Alpha Telcom, Inc.</u>, 187 F. Supp. 2d 1250 (D. Or. 2002), affd. 350 F.3d 1084 (9th Cir. 2003).

<u>Federal Income Tax Reporting</u>

For 2000 petitioner filed a Form 1040, U.S. Individual Income Tax Return, that included a Schedule C relating to the pay phone activity.  On the 2000 Schedule C petitioner reported gross receipts or sales of $45,440 and claimed deductions for depreciation ($101,440) and legal and professional services ($1,200).

For 2001 petitioner filed a Form 1040 that included a Schedule C relating to the pay phone activity.[4]  On the 2001 Schedule C, petitioner claimed a depreciation deduction of $60,864.  Petitioner also attached to his Form 1040 a Form 3800, General Business Credit, reporting a $2,829 general business credit carryforward, but he did not use the credit to offset any part of his 2001 Federal income tax liability.  Petitioner attached to the 2001 Form 1040 a statement explaining that he could not use a $5,000 disabled access credit claimed for 1999 and that $2,171 was carried back and used for 1998.  The statement also explained that $2,829 was carried forward to 2000 and 2001 but could not be used for those years.[5]

Petitioner filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 2000 reporting additional adjusted gross income of $1,643.  He filed a second Form 1040X for 2000 reporting additional adjusted gross income of $47,083 and a disabled access credit of $3,931.  In the Explanation of Changes to Income, Deductions, and Credits on the second 2000 amended return, petitioner explained that he had failed to claim a

---

[4]The 2000 and 2001 Schedules C identify the Schedule C activity as "Disabled ACC Phones" and do not refer to the ATMs petitioner acquired in 2000.

[5]The disabled access credit for 1999 presumably results from the pay phones purchased in 1999.

disabled access credit carryforward of $3,931 for 2000 and $1,069 for 1999.

On February 8, 2006, respondent sent petitioner a notice of deficiency for 2000 and 2001.  Respondent determined:  (1) Petitioner was not entitled to the depreciation deductions he claimed on his 2000 and 2001 Schedules C; (2) petitioner was not entitled to a deduction for legal and professional services claimed on his 2000 Schedule C; (3) petitioner had unreported income from Alpha Telcom of $45,440 and $26,297 for 2000 and 2001, respectively; and (4) petitioner was not entitled to the disabled access credits claimed in 2000 and 2001.[6]  Respondent also made several computational adjustments.  Petitioner filed a petition contesting respondent's determinations.

OPINION

I.   Depreciation Deductions

Section 167(a) generally allows a depreciation deduction for the exhaustion and wear and tear of property used in a trade or business or property held for the production of income. Depreciation deductions are based on an investment in and actual ownership of property rather than on possession of bare legal

_____

[6]In the notice of deficiency respondent disallowed the disabled access credits for 2000 and 2001.  Petitioner claimed a disabled access credit carryforward in 2001; but because petitioner owed no tax liability, he did not use the credit in calculating his tax liability on the return.

title.  Arevalo v. Commissioner, supra at 251.[7]  It is well established that the mere transfer of legal title does not transfer the incidents of taxation attributable to property ownership where the transferor retains significant control over the property.  See Crooks v. Commissioner, 453 F.3d 653, 656 (6th Cir. 2006); Arevalo v. Commissioner, supra at 251; see also Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978).

A taxpayer is entitled to depreciation deductions with respect to property only if the benefits and burdens of owning the property have passed to the taxpayer.  Arevalo v. Commissioner, supra at 251.  Whether the taxpayer has received the benefits and burdens of ownership is a question of fact that must be determined from the parties' intent as established by written agreements read in the light of the attending facts and circumstances.  Id. at 251-252; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981).  This Court and several Courts of Appeals have held that taxpayers who invested in Alpha Telcom pay phones did not receive the benefits and burdens of ownership required for them to claim depreciation deductions

---

[7]In his brief petitioner repeatedly argues that we stated during trial that in deciding this case we would not rely on Arevalo v. Commissioner, 124 T.C. 244 (2005), affd. 469 F.3d 436 (5th Cir. 2006), and Crooks v. Commissioner, 453 F.3d 653 (6th Cir. 2006).  Petitioner is mistaken.  At trial we simply stated that respondent's pretrial memorandum was not evidence in this case.  We did not indicate that we would refrain from relying on relevant cases in our opinion.

under section 167. Crooks v. Commissioner, supra at 656; Arevalo v. Commissioner, supra at 253; Sita v. Commissioner, T.C. Memo. 2007-363, affd. without published opinion 103 AFTR 2d 2009-1174, 2009-1 USTC par. 50,275 (7th Cir. 2009).

In Arevalo v. Commissioner, supra at 252, we identified eight factors for determining whether a taxpayer such as petitioner who invested in Alpha Telcom pay phones held the benefits and burdens of owning the pay phones. Those factors include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property.

Petitioner received only bare legal title to the pay phones. He never had control over or possession of the pay phones, and all information regarding the pay phone locations came from Alpha Telcom.[8] Alpha Telcom controlled the location of and entered

---

[8]When petitioner signed the pay phone purchase agreement, the attached telephone equipment list did not identify the pay phones petitioner was purchasing. Moreover, after Alpha Telcom filed for bankruptcy, petitioner did not take possession of the
(continued...)

into site agreements for the pay phones, collected monthly revenues, paid vendor commissions and fees, and repaired and maintained the pay phones. Alpha Telcom was entitled to 70 percent of the monthly adjusted gross revenues as long as they exceeded $58.34. The record does not show that petitioner paid any property taxes, insurance premiums, or license fees with respect to the pay phones.

Petitioner also bore no risk of loss with respect to the pay phones. Alpha Telcom agreed to buy back the pay phones from petitioner for a fixed price stated in the pay phone purchase agreement. Alpha Telcom often paid petitioner a base amount of $58.34 per month regardless of pay phone profits.

Petitioner also received only bare legal title to the ATMs. He never took possession of the ATMs, nor could he specify the locations of the ATMs other than identifying them as somewhere in Florida. Petitioner testified that the ATMs were tied to Alpha Telcom and that Alpha Telcom gave him pictures of what the ATMs looked like. When petitioner stopped receiving checks for his ATMs, he called someone in Texas who told him that NEP had moved the ATMs to a warehouse in Texas. Although petitioner testified that he made several telephone calls to discover what happened to his ATMs after the Alpha Telcom bankruptcy, petitioner never

---

[8](...continued)
pay phones, and he could not credibly explain what happened to them.

hired a lawyer or tried to take legal action to retrieve his ATMs.

After analyzing the purchase and service agreements with respect to both the pay phones and the ATMs and the facts and circumstances of this case, we conclude that the factors weigh against petitioner.  Petitioner never received the benefits and burdens of ownership with respect to the pay phones and the ATMs. Therefore, we sustain respondent's determination disallowing petitioner's 2000 and 2001 depreciation deductions.

II.  <u>Legal and Professional Services</u>

In addition to the depreciation deductions, petitioner claimed on his 2000 Schedule C a deduction for legal and professional services.  In the notice of deficiency respondent disallowed this deduction on the ground that the pay phone activity was not a business.

Section 162(a) authorizes a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.  To be engaged in a trade or business with respect to which deductions are allowable under section 162, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35 (1987).

As we have already stated, petitioner never received the benefits and burdens of ownership with respect to the pay phones or the ATMs that would entitle him to the incidents of taxation attributable to their ownership. Because petitioner never had the benefits and burdens of owning the pay phones or the ATMs and did not conduct any business involving the pay phones and the ATMs, we conclude that he was not engaged in a trade or business with respect to the pay phone and ATM activity. And because petitioner did not introduce any evidence regarding the nature of the services and their connection, if any, with the income generated by the pay phone and ATM activity, petitioner has failed to show that he was entitled to deduct these expenses under section 212.[9] We hold that petitioner is not entitled to the deduction for legal and professional services claimed on his 2000 Schedule C.

III. Alpha Telcom Income

Respondent argues that the $45,440 of gross receipts or sales reported on petitioner's 2000 Schedule C should be reclassified as other income on his Form 1040 because petitioner was not engaged in a trade or business. We agree. As we have already stated, petitioner's pay phone and ATM activity was not a trade or business. Thus, any moneys received from the pay phone

_____

[9]Sec. 212 provides that an individual is allowed as a deduction all the ordinary and necessary expenses incurred during the taxable year for the production or collection of income.

and ATM activity reported on petitioner's 2000 Schedule C are miscellaneous items of gross income and should be reported as other income on his Form 1040. See sec. 1.61-14, Income Tax Regs.

Respondent also argues that petitioner received in 2001 but did not report $26,297 from Alpha Telcom. The parties introduced in evidence statements of pay phone revenue and expenses for 2001 showing that petitioner received revenue from Alpha Telcom for the pay phones during 2001. Moreover, petitioner does not argue that he did not receive the Alpha Telcom income in 2001 as respondent contends. Thus, we sustain respondent's determinations.

IV. Disabled Access Credit

For purposes of the general business credit under section 38, section 44(a) provides a disabled access credit for certain small businesses. The amount of the credit is equal to 50 percent of the "eligible access expenditures" of an "eligible small business" that exceed $250 but that do not exceed $10,250 for the year. Sec. 44(a). To claim the credit, a taxpayer must show that (1) the taxpayer is an "eligible small business" during the year, and (2) the taxpayer has made "eligible access expenditures" during the year.

The term "eligible small business" means a taxpayer who elects the application of section 44 and had gross receipts of no

more than $1 million or no more than 30 full-time employees
during the preceding year.  Sec. 44(b).  The term "eligible
access expenditure" means amounts paid or incurred to enable an
eligible small business to comply with the requirements under the
ADA.[10]  Sec. 44(c)(1).  Only a taxpayer who has an obligation to
comply with the ADA requirements can make an eligible access
expenditure.  As relevant here, the ADA requirements apply to (1)
persons who own, lease, lease to, or operate certain "public
accommodations" and (2) "common carriers" of telephone voice
transmission services.  See 42 U.S.C. sec. 12182(a) (2006);  47
U.S.C. sec. 225(c) (2006).

This Court and several Courts of Appeals have held that
taxpayers who invested in Alpha Telcom pay phones did not have an
obligation to comply with the requirements set forth in the ADA.
Crooks v. Commissioner, 453 F.3d at 657; Arevalo v. Commissioner,
124 T.C. at 257-258; Sita v. Commissioner, T.C. Memo. 2007-363.
This case is no different.  Petitioner did not own, lease, lease

---

[10]Eligible access expenditures include amounts paid or
incurred:  (1) For removing architectural, communication,
physical, or transportation barriers that prevent a business from
being accessible to, or usable by, individuals with disabilities;
(2) to provide qualified interpreters or other effective methods
of making aurally delivered materials available to individuals
with hearing impairments; (3) to acquire or modify equipment or
devices for individuals with hearing impairments; or (4) to
provide other similar services, modifications, materials, or
equipment.  Sec. 44(c)(2).  However, eligible access expenditures
do not include expenditures that are not necessary to accomplish
such purpose.  See sec. 44(c)(3).

to, or operate public accommodations with respect to the pay phone and ATM activity.  Therefore, petitioner was not obligated to comply with ADA requirements and did not make any eligible access expenditures with respect to the pay phone and ATM activity.[11]  We conclude that petitioner is not entitled to the disabled access credit carryforward claimed in 2000 and 2001.

We have considered all arguments raised by the parties, and to the extent not discussed, we find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[11]Petitioner cites <u>Hubbard v. Commissioner</u>, T.C. Memo. 2003-245, in support of his argument that he is entitled to a disabled access credit for the pay phones and the ATMs.  However, <u>Hubbard</u> is distinguishable from this case.  In <u>Hubbard</u>, unlike here, the taxpayers maintained a place of public accommodation and thus were required to comply with ADA requirements.