T.C. Memo. 2005-248

UNITED STATES TAX COURT

DENNIS L. ROGERS AND CHARLOTTE ROGERS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13428-02.              Filed October 26, 2005.

Dana R. Taylor, for petitioners.

Kelley A. Blaine and Robert V. Boeshaar, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined deficiencies in petitioners' income tax of $186,536 for 1997 and $269,225 for 1998 and that petitioners are liable for the addition to tax for late filing under section 6651(a)(1)[1] of $45,384 for 1997 and

_____

[1] Unless otherwise stated, section references are to the

                                        (continued...)

$66,056.25 for 1998 and the accuracy-related penalty under section 6662(a) of $37,307.20 for 1997 and $53,845 for 1998.

After concessions,[2] the sole issue for decision is whether petitioners are liable for accuracy-related penalties of $3,354 for 1997 and $27,638 for 1998. We hold that they are.

FINDINGS OF FACT

Some of the facts were stipulated and are so found.

A. Petitioners

Petitioners are married and resided in Corbett, Oregon, when they filed their petition. Petitioners are high school graduates. Charlotte Rogers attended 1 year of college.

Charlotte Rogers was employed as a bookkeeper and general office worker from 1958 to 1961. She worked in sales for United Airlines from 1961 to 1973. She was a Shaklee distributor from 1973 to 1987, and she owned and operated a restaurant from 1987 to 1992. Dennis Rogers owned Columbia Sheetmetal until February 1993. Beginning around 1965, petitioners began to buy rental

---

[1](...continued)
Internal Revenue Code as amended and in effect for 1997 and 1998. Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties stipulated that petitioners' trusts were invalid for tax purposes and that petitioners have deficiencies in income tax of $16,771 for 1997 and $138,190 for 1998 and are liable for the addition to tax for late filing under sec. 6651(a)(1) of $2,768 for 1997 and $33,490 for 1998. They further stipulated that the amounts of the accuracy-related penalty at issue in this case are $3,354 for 1997 and $27,638 for 1998.

properties and parcels of land for investment. Petitioners' oldest son, Spencer Rogers, managed petitioners' real estate. Petitioners had an accountant for their businesses before 1992. Petitioners also have always had a family attorney.

B.   Nikken, Inc.

Dennis Rogers used healthcare products by Nikken, Inc. (Nikken), for back problems he has had since 1974. Nikken is a marketing company that sells nutritional, health, and personal wellness products. Nikken distributors sell products and earn income by creating a network of marketers (i.e., "downline" marketers). When downline marketers sell products, "upline" Nikken distributors may earn a commission on the sales. Petitioners began working as Nikken distributors in 1992 and were very successful in 1997 and 1998.

C.   The Trusts

1.   Petitioners' Purchase of Trusts

Ruth Williams (Williams), a Nikken distributor upline from petitioners, suggested that petitioners investigate placing their assets in trusts. In 1996, Williams and petitioners attended a presentation by Shawn Dunn of the Aegis Co. relating to placing their assets in trusts. Petitioners did not buy any Aegis products or services.

Petitioners became interested in a trust package from Advanta Strategies, which later became World Contract Services

(WCS).  WCS held periodic meetings for its trust clients. Speakers at those meetings discussed technical procedures for administering WCS trusts.

James Becker (Becker) sold WCS products on commission. Becker told petitioners they could rely on WCS staff to answer any of their questions.  Petitioners received and reviewed a WCS document entitled "Trust Information and Instruction Manual" that said that trusts made it easier to:  (a) Protect financial resources; (b) handle daily details and routine; (c) avoid delays in settling a decedent's estate; (d) reduce probate costs; (e) reduce taxes; (f) protect privacy; (g) assure immediate distribution of trust assets in a manner that is safer than distributing those assets outside a trust; (h) provide flexible forms of organization and operation to manage an individual's assets; and (i) provide opportunities for charitable giving.  The document described the tax advantages as follows:

> One of the most useful advantages of a trust is the reduction or elimination of income and estate taxes. When a trust is constructed in a proper way, it gives "income splitting" advantages.  That is: money (passive and portfolio income) earned by the trust is separated from money that is earned by the person who gave the property to the trust.  For example, a taxpayer earned $30,000 from their job and another $25,000 from passive income making them pay taxes on $55,000.  When they put the passive income into a trust, the trust could pay taxes on the $25,000 and the taxpayer would move into a lower tax bracket.  Dropping from the higher tax bracket to the lower tax bracket offers a tremendous savings.  This is the advantage of "splitting income". The use of a business trust can eliminate self-employment tax and trusts in general are allowed to

> donate up to 100% of their income to charity which is another way to lower tax liability.

Becker gave petitioners a WCS booklet entitled "Structuring Your Practice for Profit, Privacy & Protection" which described, inter alia, substantial income and estate tax savings by using trusts.

On a date not stated in the record, petitioners paid $15,000 to Becker for a trust package from WCS which included a business trust known as Global Wellness Trust (Global Wellness), a primary trust known as Wealth Unlimited Investments Trust (Wealth Unlimited), and 20 holding trusts. Petitioners created Global Wellness on December 1, 1996. Petitioners completed a WCS new client application and trust purchase agreement on April 3, 1997. Petitioners appointed James Galligan (Galligan) and Secured Protections, Inc., as cotrustees for Global Wellness. Petitioners appointed Galligan and Real Protections, Inc., as trustees for Wealth Unlimited. Becker was trustee for Real Protections, Inc.

2. <u>Operating the Trusts</u>

Petitioners purportedly conveyed to the trusts all of their personal assets, real estate assets, and assets related to their Nikken sales distributorship.

During the years in issue, petitioners used money distributed to Wealth Unlimited from Global Wellness to improve their principal residence and to make double payments on the mortgage on their principal residence.

In 1998, petitioners unsuccessfully tried to have the trusts obtain a loan to buy a new motor home. Petitioners then had the trusts transfer three parcels of real property to them so that they could refinance those parcels. On the refinancing loan application petitioners stated that they had monthly income of $20,500, contrary to representations on the trusts' fiduciary returns that the income belonged to the trusts. Petitioners conveyed the properties back to the trusts more than a year later.

Galligan signed minutes of 28 trustees meetings which state that he attended. However, he did not attend more than two of those meetings. Charlotte Rogers, Spencer Rogers, and Becker also signed those minutes. One of the minutes stated that Spencer Rogers was appointed assistant manager of Global Wellness and keeper of the minutes.

3.   Hiring an Accountant

Jerry Dunning (Dunning), a certified public accountant (C.P.A.) since 1986, was Becker's accountant. Dunning traveled with Becker to attend a 2-day WCS meeting in Salt Lake City on dates not stated in the record. WCS staff explained their trust product at the meeting. Becker introduced Dunning to petitioners at that meeting and recommended to them that Dunning be their accountant.

D.   Tax Returns

Dunning prepared petitioners' Federal individual income tax returns for 1995-98 and returns for petitioners' trusts. He relied on summaries of income and expenses that he had received from Spencer Rogers. Dunning saw (but did not read) petitioners' trust documents.

Petitioners operated their Nikken sales distributorship as a sole proprietorship in 1995 and 1996. In those years, petitioners reported income and expenses from their Nikken sales distributorship on Schedules C, Profit or Loss From Business, attached to their Forms 1040, U.S. Individual Income Tax Return.

Petitioners' 1995 Form 1040 was filed on a date not stated in the record. Petitioners reported gross receipts of $315,270, gross income of $330,049, and net profit of $97,200 for their Nikken activity in 1995. Petitioners' 1996 Form 1040 was filed on October 19, 1998. Petitioners reported gross receipts of about $385,710, gross income of about $370,400, and net profit of $53,999 for their Nikken activity in 1996.

Petitioners did not report Nikken income or expenses on their Forms 1040 for 1997 and 1998. Petitioners filed their 1997 Form 1040 on June 1, 1999, reporting zero tax due. Petitioners signed their 1998 Form 1040 on October 16, 2000, and filed it on a date not stated in the record. In it, they reported tax due of $769.

On its tax returns for 1997 and 1998, Global Wellness reported income generated by petitioners' Nikken activity as passive income, claimed expenses and losses, and distributed the net income to Wealth Unlimited. Global Wellness deducted the distributions in the amounts reported as distributed to Wealth Unlimited. Global Wellness reported total income of $361,154 for 1997 and $705,616 for 1998 and zero tax for 1997 and 1998.

On its income tax returns for 1997 and 1998, Wealth Unlimited reported the Global Wellness distributions as passive income. Wealth Unlimited reported on its 1998 trust income tax return that it had distributed the amounts it had received from Global Wellness to Nick Rogers, Tude Tide, and V & S Trust. Wealth Unlimited reported a loss of $66,887 for 1997 and income of $216,975 for 1998 and zero tax for 1997 and 1998.

Petitioners reported on their Forms 1040 adjusted gross income of $142,343 in 1995, $97,081 in 1996, $9,546 in 1997, and $17,628 in 1998. Petitioners' standard of living did not change when they began using trusts even though their adjusted income dropped precipitously.[3] Petitioners did not offer any authority for recognizing their trusts for tax purposes or disclose their trusts on their individual returns for 1997 and 1998.

---

[3] Mrs. Rogers testified that petitioners' "style of life", which we take to mean standard of living, did not change when petitioners began using trusts.

OPINION

## A.   Accuracy-Related Penalty

A taxpayer is liable for an accuracy-related penalty in the amount of 20 percent of any part of an underpayment attributable to, among other things, a substantial understatement of income tax, negligence, or disregard of rules or regulations.  Sec. 6662(a) and (b)(1) and (2).  The amount of the understatement is reduced by amounts attributable to items (1) for which there was substantial authority for the taxpayer's position, or (2) adequately disclosed on the taxpayer's return or in a statement attached to the return if there is a reasonable basis for the tax treatment of the items at issue by the taxpayer.  Sec. 6662(d)(2)(B).  The accuracy-related penalty does not apply to any part of an underpayment for which there was reasonable cause and with respect to which the taxpayer acted in good faith.  Sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.

## B.   Whether Respondent Met the Burden of Producing Evidence Showing That Petitioners Are Liable for the Accuracy-Related Penalty

Petitioners contend that respondent did not meet the burden under section 7491(c) of producing evidence showing that they are liable for the accuracy-related penalty for 1997 and 1998.  We disagree.

Section 7491(c)[4] places on the Commissioner the burden of producing evidence showing that it is appropriate to impose a particular addition to tax.  However, the Commissioner need not produce evidence relating to defenses such as reasonable cause or substantial authority.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001); H. Conf. Rept. 105-599, at 241 (1998), 1998-3 C.B. 747, 995.  To meet the burden of production under section 7491(c), respondent must produce evidence showing that it is appropriate to impose the accuracy-related penalty under section 6662(a).  Once respondent meets that burden, petitioner must, in order to not be found liable for the addition to tax, produce evidence sufficient to show that respondent's determination is incorrect.  See Higbee v. Commissioner, supra at 447.

Respondent has produced evidence showing that imposition of the accuracy-related penalty under section 6662(a) is appropriate by showing that petitioners substantially understated their tax for 1997 and 1998.  Petitioners reported tax due on their income tax returns of zero for 1997 and $769 for 1998.  The amounts of tax required to be shown were $16,771 for 1997 and $139,059

---

[4]  Sec. 7491(c) provides:

   SEC. 7491(c). Penalties.--Notwithstanding any other provision of this title, the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title.

($138,290 deficiency plus $769 shown on the return) for 1998. Thus, petitioners' understatements of tax were greater than 10 percent of the amount required to be shown and $5,000 for 1997 and 1998.

Petitioners contend that, in meeting the burden of production under section 7491(c), respondent may not rely on their concession in the stipulation that the trusts were invalid for tax purposes. We disagree. The Commissioner may take a taxpayer's concession into account to meet the burden of production under section 7491(c). See e.g., Montagne v. Commissioner, T.C. Memo. 2004-252; Oatman v. Commissioner, T.C. Memo. 2004-236. Petitioners cited no authority to the contrary.

Respondent has met the burden of production even without considering petitioners' concession. The stipulation of facts, documents admitted in evidence, and testimony at trial show that petitioners personally benefited from trust assets, petitioners treated trust property as their own, petitioners did not follow trust formalities, and trust minutes were not reliable. This evidence is sufficient to meet respondent's burden of production.

We conclude that respondent has met the burden of producing evidence showing that it is appropriate to impose the accuracy-related penalty under section 6662(a) for 1997 and 1998.

C. Whether Petitioners Are Liable for the Accuracy-Related Penalty

A taxpayer is not liable for the accuracy-related penalty under section 6662(a) and (b)(1) if there was reasonable cause for the underpayment and the taxpayer acted in good faith. Sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. Reliance in good faith by the taxpayer on the advice of a qualified adviser may constitute reasonable cause. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners contend that they are not liable for the accuracy-related penalty under section 6662(a) and (b)(1) because they reasonably relied in good faith on Dunning, their C.P.A. and return preparer.[5] Sec. 6664(c)(1). We disagree. Petitioners could not reasonably have believed that they could use the trusts to eliminate all of their self-employment tax liabilities for 1997 and 1998 and all or almost all of their Federal income tax liabilities for those years. Tax benefits of this magnitude should have caused petitioners to question the validity of the trust scheme. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Gale v. Commissioner, T.C. Memo. 2002-54. In such cases, taxpayers have a duty to reasonably inquire into the

_____

[5] Petitioners contend that respondent bears the burden of proof under sec. 7491(a). We need not decide which party bears the burden of proof because the outcome in this case does not depend on the burden of proof.

validity of the tax benefits. See Zmuda v. Commissioner, 731 F.2d 1417, 1422-1423 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners did not obtain independent advice or look beyond the trust promoters and an accountant (Dunning) to whom they were referred by Becker, from whom they bought the trust package. Their claim of good faith reliance on Dunning is not persuasive; they should have sought confirmation from a reliable and disinterested adviser. See Collins v. Commissioner, supra (taxpayer failed to obtain independent tax advice); Edwards v. Commissioner, T.C. Memo. 2002-169 (taxpayer could not rely on the trust promoter), affd. 119 Fed. Appx. 293 (D.C. Cir. 2005); Lincir v. Commissioner, T.C. Memo. 1999-98 (reliance on an accountant's advice about the tax treatment of an investment program was not in good faith where the accountant could earn more if his clients invested in the program), affd. 32 Fed. Appx. 278 (9th Cir. 2002).

Petitioners contend that the fact that Dunning was in contact with WCS and attended a WCS meeting shows that it was reasonable to rely on him. We disagree. Dunning's relationship with Becker and WCS should have put petitioners on notice that he was not independent or disinterested.

Petitioners cite Kantor v. Commissioner, 998 F.2d 1514, 1522-1523 (9th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1990-380; Norgaard v. Commissioner, 939 F.2d 874, 880 (9th

Cir. 1991), affg. in part and revg. in part T.C. Memo. 1989-390; and Baxter v. Commissioner, 816 F.2d 493, 496 (9th Cir. 1987), affg. in part and revg. in part T.C. Memo. 1985-378, for the proposition that petitioners' incorrect treatment of their trusts for tax purposes does not in itself justify imposition of the accuracy-related penalty. We disagree. None of those cases involved a taxpayer's claim of reliance on an accountant, and all of the cases included factors favorable to the taxpayers which are not present here. The taxpayers in both Kantor and Baxter presented a viable (although ultimately unsuccessful) challenge to the Commissioner's adjustments. Kantor v. Commissioner, supra at 1522-1523; Baxter v. Commissioner, supra at 496. Petitioners did not. See, e.g., Neeley v. United States, 775 F.2d 1092 (9th Cir. 1985); Zmuda v. Commissioner, supra; Schulz v. Commissioner, 686 F.2d 490, 493 (7th Cir. 1982), affg. T.C. Memo. 1980-568; Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980); Hanson v. Commissioner, T.C. Memo. 1981-675, affd. per curiam 696 F.2d 1232 (9th Cir. 1983).

The taxpayers in Norgaard were held not negligent because they used a reasonable accounting system to keep track of their gambling losses and they did not lack due care or fail to do what a reasonable and prudent person would do. Norgaard v. Commissioner, supra at 880. Kantor, Norgaard, and Baxter do not support petitioners.

We conclude that petitioners did not make a good faith effort to ascertain their tax liabilities for the years in issue, that it was not reasonable for them to rely on Dunning, and that they are liable for the addition to tax for substantial understatement under section 6662(a) for 1997 and 1998.

To reflect concessions and the foregoing,

<u>Decision will be entered under Rule 155</u>.