T.C. Memo. 2017-126

UNITED STATES TAX COURT

GEORGE FAKIRIS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18292-12.                     Filed June 28, 2017.

Neil David Katz, Richard Stephen Kestenbaum, and Bernard Stephen Mark,
for petitioner.

Marc L. Caine and Peggy J. Gartenbaum, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined the following deficiencies and

penalties with respect to petitioner's Federal income tax:[1]

_____

[1]Unless otherwise noted, all section references are to the Internal Revenue
Code of 1986 (Code), as amended and in effect for the years at issue, and all Rule
(continued...)

| [*2] | | Accuracy-related penalties | |
|------|------------|------------|------------|
| Year | Deficiency | Sec. 6662(a) | Sec. 6662(h) |
| 2006 | $129,732 | -0- | $51,893 |
| 2007 | 167,680 | -0- | 67,072 |
| 2008 | 32,449 | $1,017 | 8,945 |

After concessions,[2] the issues for decision are whether petitioner is: (1) entitled to carryover charitable contribution deductions for the years at issue in connection with a purported gift made in 2004 of a theater building and (2) liable for the accuracy-related penalties that respondent determined.

## FINDINGS OF FACT

Some of the facts have been stipulated and, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner resided in New York at the time his petition was filed.

## I.    Background

During the relevant years petitioner was a commercial real estate owner and developer. He was the managing member of Grou Development LLC (Grou),

---

[1](...continued)
references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[2]Petitioner stipulated that he failed to report $29,456 of taxable interest for 2008.

[*3] which was principally engaged in the business of renting and developing real estate.

## II.     Grou's purchase of the St. George Theatre

On March 14, 2001, Grou purchased the St. George Theatre in Staten Island, New York (St. George or theater), for $700,000.[3]  The St. George was a movie and vaudeville house.  It originally opened for business on December 4, 1929, and from 1938 to 1972 was used as a movie theater.  Between 1972 and 2001 the theater was used only sporadically.

At the time Grou acquired the St. George, it was dilapidated and in need of substantial repairs and restoration.  Vandalism in some areas of the theater had resulted in broken fixtures, debris, and graffiti.  Other areas had experienced severe water damage.  The flooring of the orchestra level of the theater was unsound, and the electrical, plumbing, and mechanical systems required repair or replacement. From the time it purchased the St. George to the time it transferred it in a bargain sale (discussed hereafter), Grou made no significant repairs to the theater other than some patching of the roof.

Grou initially planned to raze the St. George and erect a highrise structure in its place.  However, after encountering significant community opposition to that

_____

[3]The seller financed $500,000 of the purchase price and received a mortgage collateralizing the underlying note.

[*4] plan, Grou sought instead to divest itself of the theater by donating it to a tax-exempt organization. Grou offered the theater to the City of New York and to a local college. Each declined the offer.

## III.    Richmond Dance and WEMGO

On or about December 15, 2003, Rosemary Cappozalo[4] and two of her daughters organized a nonprofit corporation, Richmond Dance Ensemble, Inc. (Richmond Dance), with the express purpose (besides dance training and performance) of providing for the preservation, restoration, and use for the public good of the St. George. Contemporaneously therewith, Mrs. Cappozalo engaged in negotiations with representatives of Grou regarding acquisition of the theater by Richmond Dance. Sometime before June 29, 2004, the parties agreed in principle that Grou would donate the theater to Richmond Dance.

Petitioner was concerned, however, that Richmond Dance had not yet been recognized by the Internal Revenue Service (IRS) as a tax-exempt organization eligible to receive deductible charitable contributions for Federal income tax purposes. Mrs. Cappozalo had a relationship with a representative of WEMGO Charitable Trust, Inc. (WEMGO), which unlike Richmond Dance was at the time

---

[4]The parties' stipulations are not consistent as to the spelling of Mrs. Cappozalo's surname. Our spelling herein is consistent with that on documents in evidence that she signed.

[*5] recognized by the IRS as exempt from Federal income tax under section 501(c)(3) and therefore eligible to receive such contributions.[5] Mrs. Cappozalo, the WEMGO representative, and Grou agreed to an arrangement concerning the transfer of the St. George. Since contributions to WEMGO were eligible to receive favorable tax treatment, petitioner, on behalf of Grou, agreed to transfer the theater to WEMGO. The parties have stipulated that WEMGO in turn agreed to accept Grou's transfer and to subsequently transfer the theater to Richmond Dance.

IV. Transfers of the theater

On June 29, 2004, Grou and WEMGO executed a "Contract of Sale" (contract of sale) concerning a transfer of the St. George. The contract of sale included, inter alia, the following terms:

> 23. The delivery and acceptance of the deed at the Closing, without the simultaneous execution and delivery of a specific agreement which by its terms shall survive the Closing, shall be deemed to constitute full compliance by Seller [Grou] with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed. [Hereinafter, paragraph 23.]
>
> \* \* \* \* \* \* \*
>
> 29. This Agreement and the Schedules annexed hereto (a) shall be governed by and construed in accordance with the internal laws of the State of New York without regard to principles of conflicts of law and

---

[5]WEMGO was engaged primarily in two charitable activities: (1) providing affordable housing to abused women and (2) training women for garment production.

[*6] (b) shall be given a fair and reasonable construction in accordance with the intentions of the parties hereto [Grou and WEMGO]. * * *  [Hereinafter, paragraph 29.]

* * * * * * *

43.  Seller and Purchaser shall enter into the following agreement at the time of closing which shall survive closing and shall be recorded against the property when applicable:

* * * * * * *

    d.  The Bargain and Sale Deed with covenants against grantors [sic] acts conveying the Premises [St. George] to Purchaser [WEMGO] shall have a restriction prohibiting the sale/transfer or conveyance of the Premises during the first five (5) years after the conveyance to Purchaser herein except that [sic] a conveyance during that period to Richmond Dance Ensemble Inc.  [Hereinafter, paragraph 43d.]

* * * * * * *

49.  Purchaser [WEMGO] its successors and/or assigns shall be prohibited from selling the premises [St. George] for the first five (5) years after delivery of the deed.  Notwithstanding the aforesaid, Seller [Grou] may transfer the premises to Richmond Dance Ensemble Inc. once it receives its 501C(3) [sic] status from the Internal Revenue Service.  The provisions of this paragraph shall survive closing. [Hereinafter, paragraph 49.]

On the same date that Grou and WEMGO executed the contract of sale,

Grou transferred the St. George to WEMGO in exchange for $470,000.[6]  This cash

---

[6]This figure was an earlier estimate of the outstanding balance Grou owed on the $500,000 promissory note to the seller that was secured by the theater.  The amount actually required to satisfy that note was $412,037.82.  The note was

(continued...)

[*7] consideration was provided by Mrs. Cappozalo. The parties have stipulated that WEMGO did not make any payment in consideration for Grou's transfer of the theater to it. The transfer was effected by a deed dated June 29, 2004. Despite the conditions set forth in paragraph 43d of the contract of sale, the deed did not include any restriction on WEMGO's ability to sell, transfer, or convey the theater or grant to Grou any power to direct a transfer of the St. George to Richmond Dance.

Notwithstanding the contract of sale terms conditioning the transfer of the St. George to Richmond Dance upon the latter's having been recognized as tax exempt, WEMGO transferred the theater to Richmond Dance on June 29, 2004, the same day the contract of sale was executed between WEMGO and Grou. At that time, Richmond Dance had not been recognized as tax exempt. The IRS issued a letter to Richmond Dance on September 30, 2004, recognizing it as tax exempt under section 501(c)(3), effective May 11, 2004. The parties have stipulated that WEMGO did not receive any consideration for its transfer of the St. George to Richmond Dance, which was effected by a deed also dated June 29, 2004.

---

[6](...continued)
satisfied on June 29, 2004, with a payment in the foregoing amount, and Grou retained the remaining $57,962.18 of the payment from Mrs. Cappozalo.

[*8] V.     The Equity Valuation appraisals

In the latter half of 2003 petitioner, on behalf of Grou, retained Equity Valuation Associates (Equity Valuation) to appraise the theater. Equity Valuation prepared an appraisal dated November 17, 2003 (2003 appraisal). The 2003 appraisal concluded that as of November 3, 2003, the "estimated Market Value" of the theater "as is" was $4.5 million.

Before the June 2004 transfer of the theater to WEMGO, petitioner, on behalf of Grou, again retained Equity Valuation for purposes of appraising the theater. Equity Valuation prepared an appraisal dated June 23, 2004 (2004 appraisal), in which it concluded that on that date the "estimated Market Value" of the theater "as is" was $5 million.

VI.     Return positions and notice of deficiency

A.     Grou's partnership return for 2004

Grou filed a Form 1065, U.S. Return of Partnership Income, for 2004 (2004 Grou return).[7] Grou reported on the 2004 Grou return that it sold the theater on June 29, 2004, for $470,000, that its basis in the theater was $64,482, and that it realized a $405,518 capital gain from the sale ($470,000 − $64,482).

_____

[7]For its 2004 taxable year Grou had fewer than 10 partners, each of whom was an individual, and there is no indication that an election was made under sec. 6231(a)(1)(B)(ii). As to its 2004 taxable year, therefore, Grou was a small partnership under sec. 6231(a)(1)(B), and secs. 6221 to 6234 do not apply.

**[\*9]**  The 2004 Grou return does not disclose any charitable contribution with respect to the theater or indeed any noncash charitable contribution.  Instead, a statement attached to the return reports a $621,496 cash charitable contribution.  The Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., issued to petitioner (and attached to the Grou return) reported 60% of the cash charitable contribution, or $372,898, under "Other deductions".

B.     Petitioner's returns for 2004 through 2008

Petitioner's timely filed Federal income tax return for 2004 (2004 Fakiris return) reported on Schedule A, Itemized Deductions, a $3 million noncash charitable contribution and claimed a related deduction of $63,143, leaving $2,936,857 as a carryover to subsequent years, including the years at issue.  A partial Form 8283, Noncash Charitable Contributions, was included with the 2004 Fakiris return, describing the donated property as a "3000 SEAT THEATRE" in "VERY GOOD" condition.  For 2004 petitioner owned a 60% interest in Grou.  The reported $3 million noncash charitable contribution represented 60% of the $5 million appraised value shown in the 2004 appraisal.  Petitioner did not reduce the $5 million appraised value by any portion of the $470,000 bargain sale price.[8]

---

[8]Petitioner also did not report consistently with the Schedule K-1 issued to him by Grou which, as noted supra, reported a $372,898 cash charitable contribution and no noncash charitable contribution.

**[*10]** Petitioner timely filed Federal income tax returns for 2005, 2006, 2007, and 2008. For 2005 petitioner reported a charitable contribution carryover of $2,936,857 and claimed a related deduction of $25,121, leaving $2,911,736 as a carryforward. For 2006 petitioner reported a charitable contribution carryover of $3,185,746 and claimed a related deduction of $1,138,886.[9] For 2007 petitioner reported a charitable contribution carryover of $2,046,860 and claimed a related deduction of $594,111. For 2008 petitioner reported a charitable contribution carryover of $1,452,749 and claimed a related deduction of $143,516.

C.    Notice of deficiency

Respondent timely issued a notice of deficiency for petitioner's 2006, 2007, and 2008 taxable years, disallowing the $5 million noncash charitable contribution deduction apparently claimed by Grou for the 2004 taxable year[10] and making

---

[9]The charitable contribution carryovers reported on the 2006-08 returns cannot be reconciled with the figures reported on the 2005 return. Since we conclude in this opinion that no amount of charitable contribution carryforward was allowable for any of the years at issue, we see no reason to address the discrepancies any further.

[10]As our findings reflect, the 2004 Grou return did not claim a $5 million noncash charitable contribution. The record does not disclose whether Grou subsequently filed an amended return for 2004 or whether there was some other basis for the notice of deficiency's determination that it had claimed such a deduction. In any event, petitioner has not averred any error with respect to this aspect of the notice of deficiency. To the contrary, petitioner contends that Grou made a charitable contribution of at least $3.4 million (the lower value of the

(continued...)

**[\*11]** correlative adjustments for petitioner's 2006, 2007, and 2008 taxable years,

reducing the allowable charitable contribution deductions by $1,138,886,

$594,111, and $143,516, respectively.[11]  Petitioner timely filed a petition for

redetermination.

OPINION

I.     Burden of proof

Taxpayers who challenge the Commissioner's deficiency determinations

usually bear the burden of proving that those determinations are erroneous.  See

Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof

may shift to the Commissioner as to the propriety of a claimed deduction where the

taxpayer has introduced credible evidence to support the deduction, complied with

the substantiation requirements of and retained all records required by the Code,

and cooperated with the Secretary with regard to all reasonable requests for

---

[10](...continued)
theater that he concedes on brief), 60% of which passed through to him.

[11]Respondent determined that with respect to the reported noncash charitable contribution it had not been established:  (1) that all the requirements of sec. 170 and the regulations thereunder were satisfied, (2) that Grou actually owned the theater at the time of the contribution, (3) that Grou actually made the contribution, (4) that the contribution was a bona fide transaction, and (5) that Grou claimed the noncash charitable contribution deduction at the partnership level.  Alternatively, respondent determined that even if the requirements of sec. 170 and the regulations thereunder had been satisfied, it had not been established that the value of the contributed property was $5 million.

[*12] information.  See sec. 7491(a); see also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

Petitioner argues that he is entitled to such a shift in the burden of proof.  We need not decide that issue because we decide this case on the basis of a preponderance of the evidence rather than on an allocation of the burden of proof. See Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212; Viralam v. Commissioner, 136 T.C. 151, 161-162 (2011).

II.    Charitable contribution deductions

Section 170(a) allows a deduction for any charitable contribution made during the taxable year if verified under regulations prescribed by the Secretary. Section 170(c) defines the term "charitable contribution" to include a contribution or gift to or for the use of certain qualified entities.  A taxpayer who sells property for less than the property's fair market value (i.e., makes a "bargain sale") to a charity is generally entitled to a charitable contribution deduction equal to the difference between the fair market value of the property and the amount realized from the sale.  See Stark v. Commissioner, 86 T.C. 243, 255-256 (1986); Knott v. Commissioner, 67 T.C. 681, 689 (1977); Waller v. Commissioner, 39 T.C. 665, 677 (1963); sec. 1.170A-4(c)(2), Income Tax Regs.

[*13] In order for a bargain sale to constitute a charitable contribution, the seller must make the sale with the requisite charitable intent, and the fair market value of the property on the date of the sale must in fact exceed the selling price. See United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986) ("The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration."). Furthermore, the contribution is not deductible unless it constitutes a completed gift, meaning the donor "must do everything reasonably permitted by the nature of the property and the circumstances of the transaction in parting with all incidences of ownership."[12] Coffey v. Commissioner, 141 F.2d

---

[12] It is well settled that the term "charitable contribution" as it is used generally in sec. 170 and the regulations thereunder is synonymous with the term "gift". See Collman v. Commissioner, 511 F.2d 1263, 1267 (9th Cir. 1975), aff'g in part, rev'g in part, and remanding T.C. Memo. 1973-93; Seed v. Commissioner, 57 T.C. 265, 275 (1971); Sutton v. Commissioner, 57 T.C. 239, 242 (1971); Wolfe v. Commissioner, 54 T.C. 1707, 1713 (1970); Murphy v. Commissioner, 54 T.C. 249, 252 (1970); McLaughlin v. Commissioner, 51 T.C. 233, 234 (1968), aff'd, 23 A.F.T.R.2d (RIA) 69-1763 (1st Cir. 1969); Perlmutter v. Commissioner, 45 T.C. 311, 316-317 (1965); DeJong v. Commissioner, 36 T.C. 896, 899 (1961), aff'd, 309 F.2d 373, 376-379 (9th Cir. 1962); Stjernholm v. Commissioner, T.C. Memo. 1989-563, aff'd, 933 F.2d 1019 (10th Cir. 1991). Therefore, a deduction under sec. 170 is allowed only if the transfer at issue satisfies the six essential elements of a bona fide inter vivos gift:

(1) a donor competent to make the gift; (2) a donee capable of taking the gift; (3) a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the subject matter of the gift, in praesenti; (4) the irrevocable transfer of the present legal title and of the dominion and

(continued...)

- 14 -

**[\*14]** 204, 205 (5th Cir. 1944), <u>aff'g</u> 1 T.C. 579 (1943).  This means that the donor

must completely relinquish "dominion and control" over the contributed property;

the donor may not retain any right to direct the disposition or manner of enjoyment

of the subject of the gift.  See <u>Rosano v. United States</u>, 245 F.3d 212, 213 (2d Cir.

2001); <u>Pollard v. Commissioner</u>, 786 F.2d 1063, 1067 (11th Cir. 1986), <u>aff'g</u> T.C.

Memo. 1984-536; <u>Pauley v. United States</u>, 459 F.2d 624, 626-627 (9th Cir. 1972)

(citing <u>Estate of Sanford v. Commissioner</u>, 308 U.S. 39, 42-43 (1939)); <u>Viralam v.

Commissioner</u>, 136 T.C. at 162.  A donor's retention of dominion and control

renders the gift incomplete when it is exercisable against the donee.  <u>Pauley</u>, 459

F.2d at 627.

The regulations provide that no deduction is allowed for a charitable

contribution where the transfer is subject to a condition or power that on the date of

the gift is not "so remote as to be negligible."  Sec. 1.170A-1(e), Income Tax Regs.

<sub>12</sub>(...continued)
control of the entire gift to the donee, so that the donor can exercise
no further act of dominion or control over it; (5) a delivery by the
donor to the donee of the subject of the gift or the most effectual
means of commanding the dominion of it; and (6) acceptance of the
gift by the donee * * *

<u>Goldstein v. Commissioner</u>, 89 T.C. 535, 541-542 (1987) (quoting <u>Weil v.
Commissioner</u>, 31 B.T.A. 899, 906 (1934), <u>aff'd</u>, 82 F.2d 561 (5th Cir. 1936));
<u>Guest v. Commissioner</u>, 77 T.C. 9, 15-17 (1981); <u>Stjernholm v. Commissioner</u>,
T.C. Memo. 1989-563.

[*15] The phrase "so remote as to be negligible" has been interpreted to mean "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction", United States v. Dean, 224 F.2d 26, 29 (1st Cir. 1955), and "a chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance", Briggs v. Commissioner, 72 T.C. 646, 657 (1979), aff'd without published opinion, 665 F.2d 1051 (9th Cir. 1981).

Respondent argues that Grou's transfer of the St. George to WEMGO was not a completed gift because, under paragraph 49 of the contract of sale, Grou retained dominion and control over the theater after the transfer. Under the terms of paragraph 49, respondent argues, Grou could take back the theater and transfer it to Richmond Dance after the purported transfer to WEMGO. Consequently, respondent argues, no completed gift occurred and the charitable contribution deduction should be denied in full.

Petitioner counters that the restrictions imposed in paragraph 49 of the contract of sale are not in the deed and therefore are not determinative of whether

**[\*16]** Grou retained dominion and control over the theater after the transfer of title to WEMGO. For the reasons discussed below we agree with respondent.[13]

In analyzing the parties' respective positions, we are mindful that State law creates legal interests in property but Federal law determines how those interests are treated for Federal income tax purposes. See Richardson v. Commissioner, 126 F.2d 562, 567 (2d Cir. 1942) (citing Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940)), rev'g in part 39 B.T.A. 927 (1939); see also Estate of Gilchrist v. Commissioner, 630 F.2d 340, 345 (5th Cir. 1980) ("State law creates property interests but federal law determines which incidents of ownership are taxable." (citing Morgan v. Commissioner, 309 U.S. at 80-81)), rev'g and remanding 69 T.C. 5 (1977) and Estate of Reid v. Commissioner, 71 T.C. 816 (1979); Wolder v. Commissioner, 493 F.2d 608, 612 (2d Cir. 1974) ("New York law does, of course, control as to the extent of the taxpayer's legal rights to the property in question, but it does not control as to the characterization of the property for federal income tax

---

[13]Because we agree with respondent's argument that petitioner did not effect a completed gift, we need not address respondent's alternative grounds for denying the deductions, which include: (1) that petitioner failed to produce a contemporaneous written acknowledgment pursuant to sec. 170(f)(8); (2) that petitioner's appraisal summary was deficient because it did not include the requisite declarations by the appropriate appraiser; and (3) that petitioner failed to substantiate the noncash charitable contribution with a "qualified appraisal" meeting the requirements of sec. 1.170A-13(c)(3)(ii), Income Tax Regs. Respondent also argues that petitioner has failed to establish that the fair market value of the theater at the time of the contribution was $5 million.

**[*17]** purposes." (citing <u>United States v. Mitchell</u>, 403 U.S. 190, 197 (1971),

<u>Commissioner v. Duberstein</u>, 363 U.S. 278, 285 (1960), <u>Morgan v. Commissioner</u>,

309 U.S. at 80-81, and <u>Hight v. United States</u>, 256 F.2d 795, 800 (2d Cir. 1958))),

<u>aff'g in part and rev'g and remanding in part</u> 58 T.C. 974 (1972) <u>and</u> <u>aff'g</u> <u>Estate</u>

<u>of Boyce v. Commissioner</u>, T.C. Memo. 1972-204.  Thus, the extent to which Grou

retained property interests in the St. George after the transfer to WEMGO is

determined under New York law, but whether any such retained interests

constituted sufficient dominion and control to negate a charitable contribution

deduction is determined under Federal law.

The contract of sale between Grou and WEMGO imposed two significant

conditions on the transfer of the St. George to WEMGO:  (1) WEMGO was

prohibited from selling the theater during the five-year period following delivery of

the deed to it and (2) Grou retained the right during that period to transfer the

theater to Richmond Dance once the IRS recognized it as tax exempt under section

501(c)(3).  The contract further stated that these provisions "shall survive closing."

The contract elsewhere stated that the deed conveying the theater from Grou to

WEMGO was to include a five-year restriction barring WEMGO from transferring

the theater to any party other than Richmond Dance.

[*18] The contract of sale presents a threshold interpretive issue. The first sentence of paragraph 49 of the contract prohibits WEMGO from selling the theater for five years after delivery of the deed to it. But paragraph 49 then states in the next sentence: "Notwithstanding the aforesaid, Seller [Grou] may transfer the premises to Richmond Dance Ensemble, Inc. once it receives its 501C(3) [sic] status from the Internal Revenue Service." These two sentences are not readily reconcilable, as Grou could not "transfer" the theater to Richmond Dance (or any person) after the deed had been delivered to WEMGO. The subject of a transfer to Richmond Dance is elsewhere addressed, however, in paragraph 43d of the contract, which provides that the deed conveying the theater from Grou to WEMGO "shall have a restriction prohibiting the sale/transfer or conveyance of the Premises [theater] during the first five (5) years after the conveyance to Purchaser herein [WEMGO] except that [sic] a conveyance during that period to Richmond Dance Ensemble Inc." Notwithstanding its grammatical shortcomings, paragraph 43d contemplates a transfer to Richmond Dance by WEMGO rather than Grou. Reading the contract of sale as a whole--as, under New York law, we must, see Eighth Ave. Coach Corp. v. City of New York, 35 N.E.2d 907, 909 (N.Y. 1941)[14]--we conclude that the parties to the contract of sale contemplated

_____

[14]Paragraph 29 of the contract of sale provides: "This Agreement * * * shall
(continued...)

[*19] and agreed that, for the first five years after delivery of the deed to WEMGO, Grou could <u>direct</u> WEMGO to convey the St. George to Richmond Dance in the event the latter was recognized by the IRS as tax exempt under section 501(c)(3).

Petitioner contends that the restriction on WEMGO's transfer rights in paragraph 49--and presumably Grou's right to transfer the theater to Richmond Dance under that paragraph, which petitioner does not address--are not "operative" because they do not appear in the conveyance instrument (i.e., the deed transferring the theater from Grou to WEMGO), relying on N.Y. Real Prop. Law sec. 290(3)[15] and the "merger" clause in paragraph 23 of the contract of sale.

---

[14](...continued)
be governed by and construed in accordance with the internal laws of the State of New York".

[15]N.Y. Real Prop. Law sec. 290(3) (McKinney 2006), cited by petitioner in his answering brief, provides as follows:

Sec. 290. Definitions; effect of article

3. The term "conveyance" includes every written instrument, by which any estate or interest in real property is created, transferred, mortgaged or assigned, or by which the title to any real property may be affected, including an instrument in execution of a power, although the power be one of revocation only, and an instrument postponing or subordinating a mortgage lien; except a will, a lease for a term not exceeding three years, an executory contract for the sale or purchase of lands, and an instrument containing a power to convey real property as the agent or attorney for the owner of such property.

**[*20]** We disagree with petitioner's interpretation of New York law. Under New York law, it is generally the case that the provisions of a contract for the sale of land are deemed to merge into the deed, with the latter extinguishing any claims arising under the contract after the closing of title. See Schoonmaker v. Hoyt, 42 N.E. 1059, 1060 (N.Y. 1896); Murdock v. Gilchrist, 52 N.Y. 242, 246 (N.Y. 1873). The general rule does not apply, however, "where there is a clear intent evidenced by the parties that a particular provision will survive delivery of the deed". Goldsmith v. Knapp, 637 N.Y.S.2d 434, 435 (App. Div. 1996); see also Davis v. Weg, 479 N.Y.S.2d 553, 555 (App. Div. 1984). The intent of the parties "may be derived from the instruments alone or from the instruments and the surrounding circumstances." Siebros Fin. Corp. v. Kirman, 249 N.Y.S. 497, 499 (App. Div. 1931); see also H.B. Singer, LLC v. Thor Realty, LLC, 869 N.Y.S.2d 203, 204 (App. Div. 2008); Yaksich v. Relocation Realty Serv. Corp., 391 N.Y.S.2d 822, 823 (Sup. Ct. 1977). Where the contract of sale expressly states that a certain provision shall survive the transfer of the title, i.e., "closing", the merger doctrine does not apply. See Sicignano v. Dixey, 2 N.Y.S.3d 301, 304 (App. Div. 2015); Bibbo v. 31-30, LLC, 963 N.Y.S.2d 303, 305 (App. Div. 2013); Franklin Park Plaza, LLC v. V & J Nat'l Enters., LLC, 870 N.Y.S.2d 193, 195-196 (App. Div. 2008).

[*21] We conclude that the doctrine of merger would not apply in the transaction between Grou and WEMGO. First, paragraph 49 of the contract of sale, imposing the five-year restriction on any transfer of the theater by WEMGO and entitling Grou to transfer the theater to Richmond Dance during that period, concludes as follows: "The provisions of this paragraph shall survive closing." Under the authority just cited, the provisions of paragraph 49 would not be extinguished by a deed which is silent with respect to them.

Second, paragraph 43d of the contract of sale provides that the deed conveying the theater to WEMGO "shall have a restriction prohibiting the sale/transfer or conveyance of the Premises during the first five (5) years after the conveyance to * * * [WEMGO] except that [sic] a conveyance during that period to Richmond Dance Ensemble Inc."[16] No such restriction was included in the deed, however. Under New York law, it is well settled that where parties have an existing agreement concerning particular terms, but subsequently find themselves signatories to an instrument that does not accurately reflect that agreement, equity will reform the instrument. See Harris v. Uhlendorf, 248 N.E.2d 892, 894 (N.Y. 1969); Born v. Schrenkeisen, 17 N.E. 339, 341 (N.Y. 1888); Beebe v. La Pierre, 494 N.Y.S.2d 225, 227 (App. Div. 1985). The principle extends to cases such as

---

[16]We note also that the prefatory language to paragraph 43d also states that the agreement contained in that paragraph "shall survive closing".

**[*22]** this where a written contract of sale for real property states that certain restrictions are to be included in the deed, but the deed as recorded does not include them. See Goldsmith, 637 N.Y.S.2d 434. In these circumstances, the party seeking to enforce the restrictions may obtain a reformation of the deed to include the restrictions. See Lent v. Cea, 619 N.Y.S.2d 166 (App. Div. 1994). Thus, had WEMGO sought to convey the St. George during the first five years to someone other than Richmond Dance, Grou would have been entitled under New York law to prevent the transfer and obtain a reformation of the deed.

Finally, petitioner's reliance on paragraph 23 of the contract of sale is misplaced. Paragraph 23 is a boilerplate merger provision. It states:

> The delivery and acceptance of the deed at the Closing, without the simultaneous execution and delivery of a specific agreement which by its terms shall survive the Closing, shall be deemed to constitute full compliance by Seller [Grou] with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed.

For starters, the paragraph provides relief to the seller only; it offers no protection for WEMGO as purchaser for any failure of it to comply with the terms of the contract of sale. The contract of sale restrictions at issue here apply to WEMGO, not Grou. Even if the paragraph could somehow be construed to offer parallel protections to WEMGO for its failure to comply with any terms of the contract of sale, the paragraph at best merely restates the merger doctrine,

[*23] including the exception for "a specific agreement which by its terms shall survive the Closing" that is simultaneously executed and delivered at the time the deed is. As we have discussed, paragraph 49 of the contract of sale, the source of the restrictions at issue, was by its express terms intended to survive closing. The contract of sale was executed and delivered[17] simultaneously with the deed on June 29, 2004. Consequently, paragraph 23 does nothing to extinguish the restrictions outlined in paragraph 49.

In sum, petitioner's contention that the restrictions in the contract of sale were not "operative" under New York law is unavailing.

Reading the contract of sale as a whole, WEMGO agreed not to sell the St. George for five years after obtaining legal title, during which time Grou retained the right to direct the transfer of the title to Richmond Dance in the event the condition of its obtaining IRS recognition of section 501(c)(3) tax-exempt status were satisfied. WEMGO's agreement to a restriction on transferability, coupled with Grou's retention of the right to direct the transfer of ownership of the theater for five years, afforded Grou a substantial--indeed paramount--element of dominion and control over the subject of the purported gift, exercisable against the

---

[17]Under New York law, a written instrument is "delivered" where the parties to the instrument "intend that the same should be operative and binding upon them". Sarasohn v. Kamaiky, 86 N.E. 20, 24 (N.Y. 1908).

**[*24]** purported donee WEMGO, after the transfer of legal title to it.  See Pauley,

459 F.2d at 627 ("Dominion and control, the retention of which by a donor will

render a gift incomplete for purposes of tax deduction, is dominion and control

exercisable against the donee:  the retention by the donor of power to direct the

disposition or manner of enjoyment of the subject of the gift.").

Grou's retained right to direct the transfer of the theater to Richmond Dance

would defeat the transfer to WEMGO, and the condition giving rise to Grou's right

to direct a transfer to Richmond Dance was not in the least remote.  There is no

evidence that, at the time the contract of sale was executed, Richmond Dance faced

obstacles to obtaining recognition as tax exempt under section 501(c)(3) and, in

fact, Richmond Dance obtained recognition approximately 90 days after execution,

on September 30, 2004.  Moreover, the condition was in fact disregarded.  The

execution of the contract of sale, the deed transferring the theater from Grou to

WEMGO, and the deed transferring the theater from WEMGO to Richmond Dance

all took place on June 29, 2004, before Richmond Dance obtained IRS recognition

as tax exempt.[18]

---

[18]Petitioner has not argued that WEMGO's mere transitory possession of legal title to the theater should be disregarded and the transaction treated as a transfer from Grou to Richmond Dance.  His argument is premised entirely upon the proposition that Grou effected a bargain sale of the theater to WEMGO, entitling petitioner to a charitable contribution deduction passed through to him by

(continued...)

**[*25]** Grou's right under the contract of sale to direct the transfer of the St. George

to Richmond Dance rendered the gift to WEMGO conditional, and because the

possibility that the condition would be satisfied was not so remote as to be

negligible, no gift was "made" within the meaning of section 170(a)(1) and section

1.170A-1(e), Income Tax Regs.  See Graev v. Commissioner, 140 T.C. 377, 390

(2013); see also Briggs v. Commissioner, 72 T.C. at 656-659.

---

[18](...continued)
Grou.  We therefore need not consider that issue.  See Nicklaus v. Commissioner,
117 T.C. 117, 120 n.4 (2001) (noting that issues and arguments not advanced on
brief may be considered abandoned); see also Our Country Home Enters., Inc. v.
Commissioner, 145 T.C. 1, 39 n.18 (2015) (treating an argument not previously
advanced as waived or otherwise abandoned).  Nevertheless, we note that "while a
taxpayer is free to organize his affairs as he chooses, * * * once having done so, he
must accept the tax consequences of his choice, whether contemplated or not".
Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149
(1974); see also Consol. Edison Co. of N.Y., Inc. v. United States, 10 F.3d 68, 72
(2d Cir. 1993) ("[W]hen 'knowledgeable parties cast their transaction voluntarily
into a certain formal structure, . . . they should be and are, bound by the tax
consequences of the particular type of transaction which they created.'" (quoting
Fed. Bulk Carriers, Inc. v. Commissioner, 558 F.2d 128, 130 (2d Cir. 1977), aff'g
66 T.C. 283 (1976))); Television Indus., Inc. v. Commissioner, 284 F.2d 322, 325
(2d Cir. 1960) ("It would be quite intolerable to pyramid the existing complexities
of tax law by a rule that the tax shall be that resulting from the form of transaction
taxpayers have chosen or from any other form they might have chosen, whichever
is less."), aff'g 32 T.C. 1297 (1959); Estate of Durkin v. Commissioner, 99 T.C.
561, 574-575 (1992).  Petitioner, having cast this transaction as a bargain sale of
the theater to WEMGO, is bound by the tax consequences thereof.

[*26] III.    Accuracy-Related Penalties

    A.    Introduction

As to the underpayments attributable to the disallowed charitable contribution deductions, respondent determined that for each year at issue petitioner is liable for a 40% accuracy-related penalty under section 6662(h) or, in the alternative, a 20% accuracy-related penalty under section 6662(a).  Respondent also determined that petitioner is liable for a 20% accuracy-related penalty under section 6662(a) as to the underpayment attributable to the unreported interest for 2008 on the grounds that (1) there was a substantial understatement of income tax or (2) petitioner was negligent or disregarded rules or regulations.  See sec. 6662(b)(1) and (2).  Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the accuracy-related penalty on more than one of the grounds set out in section 6662(b).  See sec. 1.6662-2(c), Income Tax Regs.

The Commissioner bears the burden of production with regard to accuracy-related penalties and must come forward with sufficient evidence indicating that it is proper to impose them.  See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  When the Commissioner meets his burden of production, the burden of proof remains with the taxpayer, including the

[*27] burden of proving the extent to which an accuracy-related penalty is inappropriate because of reasonable cause. See Higbee v. Commissioner, 116 T.C. at 446-447.

B.    Section 6662(h)

Section 6662(h)(1) imposes an accuracy-related equal to 40% of the portion of the underpayment of tax attributable to a gross valuation misstatement. The Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, 120 Stat. 780, effected certain amendments to the gross valuation misstatement penalty regime. Before the passage of the PPA, the penalty applied when taxpayers misstated the value of property by 400% or more, and taxpayers could avoid the penalty under certain circumstances where the misstatement was made in good faith and with reasonable cause. The PPA lowered the threshold to 200% and eliminated the reasonable cause exception for gross valuation misstatements made in connection with charitable contributions of property. See secs. 6662(h), 6664(c). For contributions of property other than certain easements, the amendments apply to all returns filed after August 17, 2006.[19] See PPA sec. 1219(e)(1), (3), 120 Stat. at 1085-1086. This case involves a purported charitable contribution of property

_____

[19]In the case of a contribution of certain easements, the amendments apply to returns filed after July 25, 2006. See Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(e)(3), 120 Stat. at 1086.

**[\*28]** made before the effective date of the PPA for which petitioner claimed carryover charitable contribution deductions on returns filed for post-PPA taxable years, raising the question of whether the amendments apply.

We have held that Grou's transfer of the theater was not a charitable contribution "made within the taxable year" within the meaning of section 170(a)(1) and the implementing regulations because the transfer was not a completed gift. Thus, we have sustained respondent's disallowance of petitioner's claimed charitable contribution deductions for failure to satisfy a legal requirement for deductibility--a reason that does not implicate the factual question of the theater's fair market value. Nonetheless, the Supreme Court has rejected any distinction between valuation misstatements resulting from legal versus valuation errors. See Woods v. United States, 571 U.S. __, __, 134 S. Ct. 557, 565-568 (2013). Where, as here, the taxpayer is not entitled to a claimed charitable contribution deduction, the value of the property purportedly contributed is zero. See Bosque Canyon Ranch, L.P. v. Commissioner, T.C. Memo. 2015-130, at \*20-\*22. When the correct value of contributed property is zero and the value claimed is greater than zero, the gross valuation misstatement penalty applies. See sec. 1.6662-5(g), Income Tax Regs. Petitioner claimed that Grou contributed property worth $5 million for 2004 ($3 million of which was allocable to him as a 60%

[*29] partner of Grou), but the correct value of the property was zero.  Under either the pre- or post-PPA section 6662(h) threshold, petitioner's valuation misstatement is "gross" and triggers the 40% penalty.  Respondent has therefore met his burden of production as to the applicability of the section 6662(h) accuracy-related penalty to the underpayment of tax for each year resulting from the improperly claimed charitable contribution deductions.[20]

We have held that where the original gross valuation misstatement is reported on a return filed before the effective date of the PPA, but the taxpayer claims a related carryover deduction on a return filed in a subsequent year subject to the PPA amendments, the taxpayer effectively "reaffirms" the original gross valuation misstatement and the reasonable cause defense may not be raised in the latter year.  See Chandler v. Commissioner, 142 T.C. 279, 294 (2014); Reisner v. Commissioner, T.C. Memo. 2014-230, at *13; see also Mountanos v. Commissioner, T.C. Memo. 2013-138, at *18 n.9, supplemented by T.C. Memo.

_____

[20]Petitioner did not allege in his petition, at trial, or in his briefs that the accuracy-related penalties at issue were not "personally approved (in writing) by the immediate supervisor of the individual making * * * [the penalty] determination."  See sec. 6751(b)(1).  That issue is therefore deemed conceded with respect to the sec. 6662(h) penalties as well as the sec. 6662(a) penalty discussed infra pp. 30-31.  See Rule 34(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded."); cf. Lloyd v. Commissioner, T.C. Memo. 2017-60, at *7 n.3 (deeming similarly conceded any sec. 6751(b)(1) challenge to assessable penalties in a sec. 6330 review of a collection action).

[*30] 2014-38, aff'd, 651 F. App'x 592 (9th Cir. 2016).  Petitioner filed the returns at issue after the effective date of the PPA.  Consequently, the reasonable cause defense is not available to him.  The penalty for a gross valuation misstatement under section 6662(h) applies to any portion of an underpayment for a year to which a deduction is carried that is attributable to a gross valuation misstatement for the year in which the carryover of the deduction arises.  See sec. 1.6662-5(c), Income Tax Regs.  We therefore hold that the 40% gross valuation misstatement accuracy-related penalty applies to the portions of petitioner's 2006, 2007, and 2008 underpayments attributable to the charitable contribution deduction carryovers claimed for those years.

C.     Section 6662(a)

Section 6662(a) imposes an accuracy-related penalty of 20% of the portion of an underpayment of tax attributable to negligence or disregard of rules or regulations.  See sec. 6662(a) and (b)(1).  "Negligence" for this purpose "includes any failure * * * to exercise ordinary and reasonable care in the preparation of a tax return."  Sec. 1.6662-3(b)(1), Income Tax Regs.

Respondent determined that petitioner was negligent in not reporting the $29,456 of taxable interest that petitioner has conceded should have been reported for 2008.  We agree.  Petitioner's failure to report interest of this magnitude

[*31] demonstrates a failure to exercise ordinary and reasonable care in the preparation of his 2008 return and was therefore negligent. We conclude that respondent has met his burden of production as to the applicability of the 20% accuracy-related penalty to the underpayment resulting from the unreported interest, noting that we may take a taxpayer's concession into account in determining whether the Commissioner has carried his burden under section 7491(c). See Oria v. Commissioner, T.C. Memo. 2007-226, 94 T.C.M. (CCH) 170, 172 (2007); Rogers v. Commissioner, T.C. Memo. 2005-248, 90 T.C.M. (CCH) 430, 432 (2005); see also Montagne v. Commissioner, T.C. Memo. 2004-252, aff'd, 166 F. App'x 265 (8th Cir. 2006); Oatman v. Commissioner, T.C. Memo. 2004-236. As petitioner has not offered any specific argument that he had reasonable cause for his omission of the interest income, we sustain respondent's determination of the penalty.

To reflect the foregoing,

Decision will be entered for

respondent.